## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| FERNANDO HURTADO, | ) |
| PLAINTIFF, | ) ) ) |
| V. | ) Civil Action No.: _____ |
| SAP AMERICA, INC. | ) ) JURY TRIAL DEMANDED ) |
| DEFENDANT. | ) ) |

## COMPLAINT

Plaintiff Fernando Hurtado ("Plaintiff") respectfully submits the following Complaint:

## INTRODUCTION

1. Plaintiff is a former employee of SAP America, Inc. ("Defendant" or "SAP"). Plaintiff asserts claims of disability discrimination and retaliation in violation of the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.* ("ADA").

2. Plaintiff seeks declaratory and injunctive relief, back pay and lost benefits, front pay, liquidated damages, compensatory damages, punitive damages, and attorneys' fees and costs of litigation to remedy these civil rights violations.

1

## JURISDICTION AND VENUE

3. Plaintiff's claims present federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a).

4. This Court is a proper venue for Plaintiff's claims under 28 U.S.C. § 1391(b) and (c), as a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## THE PARTIES

5. Plaintiff is a resident of Atlanta, Georgia and submits himself to the jurisdiction of this Court.

6. Defendant SAP America, Inc. is a foreign profit corporation licensed to conduct business in the State of Georgia.

7. At all times relevant to this action, Defendant conducted business, maintained facilities, and derived substantial revenue in the State of Georgia and is subject to the jurisdiction and venue of this Court.

8. Defendant may be served with process by serving a copy of the Complaint and Summons on its registered agent, C T Corporation System, 289 S. Culver Street, Lawrenceville, GA 30046-4805.

9. Defendant is an employer as defined by the ADA.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Plaintiff has satisfied all administrative prerequisites to perfect his claims of disability discrimination and retaliation under the ADA. Specifically, he timely filed a Charge of Discrimination and Amended Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

11. Plaintiff has now received the Notice of Right to Sue for his claims under the ADA within the last ninety (90) days.

## FACTUAL ALLEGATIONS

12. SAP was founded in 1972 and is one of the world's leading producers of software for the management of business processes.

13. Plaintiff began his employment with SAP on or about January 8, 2018 as an Account Executive at SAP SuccessFactors.

14. SAP SuccessFactors is a Human Resources tool that provides cloud-based software for human capital management.

15. At the time of his hire, Plaintiff reported to Jeremie Colt, Vice President of SAP SuccessFactors. Mr. Colt in turn reported to Angelique Slagle, Head of SAP SuccessFactors North America.

16. Plaintiff quickly gained success at the Company through integrating into SAP.

3

17. In 2019, Plaintiff came in at 170% of his annual quota and earned an invitation to SAP's Winner's Circle.

18. In 2020, Plaintiff again overachieved his annual quota and came in over 135% of plan and again was recognized for his sales numbers.

19. Prior to 2021, Plaintiff had never received any formal performance feedback and to the contrary, he had overachieved his sales numbers two years in a row.

20. On or about January 10, 2021, Plaintiff tested positive for COVID-19.

21. On January 15, 2021, Plaintiff checked into the hospital and was put on a ventilator almost immediately due to the gravity of his condition.

22. Plaintiff spent the next several months in the hospital fighting for his life. Plaintiff's situation was so grave that the doctors had to put him in a paralytic state (i.e. life support) in order to oxygenate his organs and keep him alive. At one point, Plaintiff had so many infections running through his body while on life support that his body got up to 106 degrees and he had to be put in a cold room, laying on top of cold blankets, to get his internal temperature down.

23. Although Plaintiff eventually pulled through, his doctor's called his recovery a true miracle as they were almost certain he would not make it out alive.

24. The period during which Plaintiff was on life support and fighting for his life were extremely hard for his family including his wife and two teenage daughters as they were told that the situation was dire.

25. Even following Plaintiff's hospital stay, his life has been severely impacted as the hospital staff damaged his sciatic nerve when he was paralyzed and on life support and he currently has no sensation below his knee in his left leg, meaning that he came out of the hospital unable to walk and in a wheelchair.

26. Through hard work and rehabilitation, Plaintiff is currently able to walk with a cane.

27. Additionally, Plaintiff continues to suffer from Post-COVID Syndrome which includes symptoms such as chest pain and tightness, anxiety, and shortness of breath.

28. Plaintiff was on a leave of absence from January 2021 until July 2021.

29. Upon Plaintiff's return to work in July 2021, Plaintiff requested accommodations under the ADA which included, among other things, limited travel, breaks as needed, and an ergonomic chair.

30. Prior to Plaintiff going on a leave of absence in January 2021, Plaintiff was working on a deal with the Miami Dade County Public Schools. Plaintiff began working on that deal upon his hire with SAP and put in over two years of hard work

traveling to Miami, getting introduced and meeting with several key contacts, and building on resources to eventually make some key progress in moving towards closing the deal.

31. Prior to Plaintiff going on a leave of absence in January 2021, Miami Dade County Public Schools was in a cone of silence, a government procurement process, where they could not have communication with SAP—or any vendor—until a RFP was released.

32. Plaintiff's manager, Mr. Colt, was aware of the timing of the cone of silence and was kept abreast of timing and deadlines.

33. Mr. Colt, Human Resources, and Sedgwick were also aware that Plaintiff was scheduled to return to work on July 15, 2021—in exact parallel with the cone of silence.

34. On July 10, 2021—while Plaintiff was still on a leave of absence—he sent Mr. Colt an email that said that he had been asked how SAP would support the RFP and also told Mr. Colt that the RFP was due on July 27, 2021 (the date was later extended until August 2021). Plaintiff then stated, "Please contact them to make them aware of what resources are in place to help them until I can engage. Thank you."

35. Between when Plaintiff returned to work on or about July 15, 2021 and end of December 2021, he verbally had three discussions with Mr. Colt requesting to fully reengage in the deal.

36. However, Mr. Colt—for months—continued to evade Plaintiff's requests to reengage in the Miami Dade County Public Schools deal.

37. At some point in December 2021, Plaintiff discovered through his own research that the account had been reassigned to Graham Gallagher, another Account Executive.

38. Plaintiff was shocked and extremely disappointed that the account had been reassigned, as it was a significant deal, it was on the verge of closing, and he was the one that had made that happen through his hard work and relationships. Mr. Gallagher had put minimal, if any, effort into that deal—as he legally was not required to have contact with the customer because of the cone of silence. If fact, being that Plaintiff was the point of contact of SAP SuccessFactors, he was the one being contacted by business partners as to the status of the RFP.

39. The very little work that needed to be done from July 6, 2021 until July 15, 2021—when Plaintiff was returning from his LOA—could have been done by Mr. Colt—who was located in Florida—sales support, and/or the Industry Account Executive.

40. Upon discovering that the Miami Dade County Public Schools deal had been reassigned to another Account Executive, Plaintiff raised concerns to Mr. Colt regarding disability discrimination and retaliation—specifically Plaintiff questioned why the deal had been taken away from him while he was on a leave of absence fighting for his life due to COVID-19 complications. Plaintiff further questioned if the deal had been taken away from him simply because he was on a leave of absence and continued to reiterate that he would be in a much different position if he had never gotten sick.

41. On January 24, 2022, Plaintiff sent Mr. Colt an email regarding the Miami Dade County Public Schools deal. In that email he said that he appreciated Mr. Colt discussing the deal with him last week and told him that he had highlighted for him the relevant sections of the SAP Global Incentive Plan Terms and Conditions for Revenue Generating Roles Fiscal Year 2021 which entitled him to a commission split for that deal as government deals take a significant amount of time to close and he was the one that made the deal happen in the first place.

42. Plaintiff also told Mr. Colt he would send him a timeline of activity over the past few years which showed the significant amount of effort that he had put into Miami Dade County Public Schools releasing the RFP.

43. On February 2, 2022, having heard nothing back from Mr. Colt in response to his January 24, 2022 email, Plaintiff sent Mr. Colt a second email attaching the timeline which demonstrated his impact on the deal's development including the deal's progression through his building relationships and coordinating activities with the HR and IT staff.

44. On February 9, 2022, Mr. Colt finally responded to Plaintiff's email and stated that the LOA section of the Quota Crediting Rules "QCR" was only pertinent to transactions that closed while he was on a LOA and not applicable to future closed deals. Mr. Colt further stated that, for example, Fulton County Public Schools closed at $717,000 while he was on a LOA and he was given "full quota relief and compensation for the transaction."

45. However, there was no LOA section of the QCR.

46. Moreover, Mr. Colt's explanation was contrary to the "account reassignment" portion of the SAP Global Incentive Plan Terms and Conditions for Revenue Generating Roles which states that "Accounts may be reassigned for coverage while a Plan Participant in on leave. This would stop credit to the Plan Participant **until their return to work**" (emphasis added).

47. Again, Plaintiff had spent years working on this deal, which was close to closing, and was in a cone of silent during his leave, yet it was taken away from

him months before it closed simply because he was fighting for his life and had to take an extended leave of absence.

48. Equally as concerning—on February 10, 2021—three weeks after Plaintiff began raising concerns regarding the discrimination and retaliation he experienced by having the Miami Dade County Public Schools deal taken away from him as a result of his having gone out on a leave of absence due to his disability—Plaintiff was issued a Performance Improvement Plan ("PIP") for performance.

49. Although the whole team had received an email from Colleen Chulis, Regional Vice President of Sales, Regulated Industries, on January 24, 2022 regarding "expectations", the PIP issued to February 10, 2022 was issued solely to Plaintiff and contained "performance and behavior" expectations that not only went above and beyond those required of the rest of the team—but were simply unattainable.

50. For example, although other Account Executives were required to have a **<u>rolling</u>** four quarter pipeline of 4x multiple of opportunities to quota, Plaintiff was required to have this pipeline at all times.

51. Notably, although the PIP stated that Plaintiff had not consistently maintained such a pipeline in the past—no one had. The nature of a pipeline is such that when deals close, those deals come off the pipeline. If an Account Executive

has significant success in closing deals—as Plaintiff did—those deals would come off the pipeline.

52. Additionally, adding a minimum of $500,000 in qualified opportunities each month is simply not attainable for any Account Executive, and the PIP stated that those expectations were to continue throughout the duration of Plaintiff's employment with SAP and if he failed to demonstrate adequate progress toward meeting the expectations of his role on an ongoing basis, additional action may be taken up to and including immediate termination of his employment.

53. The fact that Plaintiff was required to add $500,000 in qualified opportunities every month for the rest of his employment—or face termination—was simply unrealistic.

54. Plaintiff had never in his career at SAP been told that his performance was a problem. In fact—prior to his getting a disability and fighting for his life—Plaintiff had consistently been a consistent performer, overachieved quota, and received recognition.

55. Moreover, following Plaintiff's leave of absence, Mr. Colt never told Plaintiff that his performance was a problem. In fact, Mr. Colt cancelled 9 out of the 11 one-on-one meetings he had scheduled with Plaintiff from July to December 2021.

56. If Plaintiff's performance was a problem, one would expect that there would be some written warning or at a minimum consistent coaching by the manager, which did not happen.

57. Upon information and belief, other employees that performed worse than Plaintiff in 2021—yet worked a full year (not half a year like Plaintiff) were not placed on a PIP.

58. In fact, upon information and belief, other Account Executives that had not made their quotas in years did not receive a PIP.

59. Following the PIP, Plaintiff questioned Mr. Colt and Ms. Chulis as to why he was being placed on a PIP given that he had never had performance feedback and more importantly the expectations in the PIP—which went above and beyond what was required of the rest of the team—were simply unrealistic given his return-to-work date and the length of time it takes government deals to close which realistically takes 18 to 24 months.

60. In October 2021, Ms. Slagle left her employment at SAP.

61. Ms. Chulis was promoted to Regional Vice President of Sales in January 2021 right as Plaintiff was going on a leave of absence. Plaintiff did not have any substantive interactions with Ms. Chulis until November 2021, a few months after he returned to work.

62. Interestingly, following Plaintiff's return to work, Ms. Chulis asked Plaintiff what his plan was, if he was planning to return to work—as if she was doubting his ability to handle the job following his leave.

63. Additionally, Ms. Chulis asked a co-worker of Plaintiff, "do you think that he is all there?" following his leave of absence demonstrating that Ms. Chulis had doubts about his ability to return to work based simply on the stigma associated with his disability, and not on any tangible performance metrics.

64. When Plaintiff spoke to Tara Rupacz, Employee Relations Partner, regarding the PIP, she acknowledged that it should have been handled differently given the lack of prior performance feedback.

65. SAP took away two accounts from him following his LOA—including the Miami Dade County Public Schools deal (which closed that same month) and would have put him at 140% of quota for 2022—yet were putting him on a PIP for failure to meet performance expectations.

66. Plaintiff never got a response as to why he was being placed on the PIP. In fact, Mr. Colt never responded to Plaintiff's February 11, 2022 email despite its request that Mr. Colt clarify what format to use for the requisite weekly updates.

67. Plaintiff also questioned Ms. Rupacz, as to why his performance in 2021 had been measured on his full year's quota despite the fact that he had been on a leave of absence from January to July.

68. According to Ms. Rupacz, an employee's quota does not get prorated when an Account Executive is on a leave of absence—meaning—that an Account Executive is severely disadvantaged for having to go on leave—especially a leave of absence that lasts half the year.

69. In other words, Account Executives with disabilities that require they take a leave of absence are disadvantaged as they are held to the same standards as individuals that worked for a full year. Plaintiff should have had his 2021 annual quota prorated to account for the six months that he was on his death bed. Instead, he was issued a PIP for being sick for six months and for having accounts taken away from him because he was on leave.

70. Plaintiff experienced extreme emotional distress—not to mention lack of progress on his post-COVID recovery—as a result of the unlawful discrimination and retaliation that he experienced. Plaintiff was already in a very mentally fragile state given his near death and his continued recovery through Post-COVID Syndrome.

71. To have his employment with SAP put into question—when he needed health insurance the most—caused Plaintiff extreme panic and anxiety.

72. On May 27, 2022, Plaintiff resigned his employment as his working conditions had become so intolerable that he felt he had no choice but to resign.

### COUNT I
### Disability Discrimination in Violation of the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.*

73. Plaintiff incorporates by reference all preceding paragraphs of the Complaint.

74. At all times relevant hereto, Defendant has been subject to the requirements of Title I of the Americans with Disabilities Act as amended by the ADAAA.

75. At all times relevant hereto, Plaintiff is an individual with a disability as defined under the Americans with Disabilities Act, 42 U.S.C. § 12102(1)(A).

76. At all times relevant hereto, Plaintiff is an individual with a disability as defined under the Americans with Disabilities Act, 42 U.S.C. § 12102(1)(B) inasmuch as he has a record of an impairment as defined by the Act.

77. At all times relevant hereto, Plaintiff is an individual with a disability as defined under the Americans with Disabilities Act, 42 U.S.C. § 12102(1)(C) inasmuch as he was regarded as a person with an impairment as defined by the Act.

78. Defendant is, and at all times relevant to this litigation was, aware of Plaintiff's disability and history and record of disability.

79. Plaintiff is, and at all times relevant hereto was, a qualified individual with a disability as that term is defined by 42 U.S.C. § 12111(8) and able to perform the essential function of his job.

80. Defendant discriminated against Plaintiff in violation of the ADA by taking adverse actions against him, including but not limited to: (a) not prorating Plaintiff's 2021 quota for the time period he was on a leave of absence due to his disability; (b) disciplining Plaintiff under false pretenses; (c) taking away the Miami Dade County Public Schools deal; and (d) constructive discharge of Plaintiff's employment.

81. Defendant's actions amount to a violation of Section 102 of the ADAAA, 42 U.S.C. § 12112, which prohibits discrimination on the basis of disability.

82. As a direct and proximate result of Defendant's intentional discrimination, the Plaintiff has suffered out-of-pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, in an amount to be established at trial.

83. In addition, Defendant's actions have caused, and continue to cause, the Plaintiff to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses all in an amount to be established at trial.

84. Moreover, Defendant's actions have caused stress that has aggravated Plaintiff's medical condition and caused increased medical bills, in an amount to be established at trial.

## COUNT II
**Retaliation in Violation of the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.***

85. Plaintiff incorporates by reference all preceding paragraphs of the Complaint.

86. Plaintiff engaged in protected conduct by requesting ADA accommodations, including a leave of absence and accommodations upon his return to work, and for raising claims of disability discrimination and retaliation.

87. Defendant retaliated against Plaintiff for engaging in protected conduct in violation of the ADA by taking adverse actions against him, including but not limited to: (a) not prorating Plaintiff's 2021 quota for the time period he was on a leave of absence due to his disability; (b) disciplining Plaintiff under false pretenses; (c) taking away the Miami Dade County Public Schools deal; and (d) constructive discharge of Plaintiff's employment.

88. Defendant's actions in retaliating against Plaintiff following his protected conduct were committed with reckless disregard for his right to be free from discriminatory treatment because of his opposition to discriminatory practices in violation of the ADA.

89. As a direct and proximate cause of Defendant's actions, Plaintiff has suffered damages including emotional distress, inconvenience, loss of income and benefits, out of pocket expenses, attorney's fees and costs, humiliation, and other indignities.

90. Defendant undertook its actions intentionally and maliciously with respect to Plaintiff and his federally protected rights, and undertook its conduct recklessly with respect to Plaintiff and his federally protected rights, entitling him to recover compensatory and punitive damages.

**WHEREFORE,** Plaintiff demands a TRIAL BY JURY and the following relief:

(a) declare that Defendant has violated Plaintiff's rights under the federal statutes listed above;

(b) permanently enjoin Defendant from violating, in the future, Plaintiff's rights under the federal statutes listed above;

(c) award Plaintiff full back pay, including all lost pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

(d) award Plaintiff prejudgment interest as required by law;

(e) award Plaintiff compensatory damages for emotional pain and suffering in an amount to be determined by the enlightened conscience of a jury;

(f) award Plaintiff front pay, including all lost future pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

(g) award Plaintiff punitive damages, against Defendant sufficient to punish it for its unlawful conduct and deter it from repeating such conduct in the future, as determined by the enlightened conscience of a jury;

(h) award Plaintiff reasonable attorneys' fees and expenses; and

(i) grant such additional relief as may be just.

Respectfully submitted, this 27th day of July, 2022.

*s/ Jackie Lee*
Jackie Lee
Georgia Bar No. 419196
LEE LAW FIRM, LLC
695 Pylant Street NE, Suite 105
Atlanta, Georgia 30306
Telephone: (404) 301-8973
jackie@leelawga.com

**COUNSEL FOR PLAINTIFF**